United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 31, 2007**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 05-20956

PHILIP BERQUIST,

Plaintiff-Appellant,

versus

WASHINGTON MUTUAL BANK,

Defendant-Appellee.

On Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and JOLLY and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

We denied Appellant's petition for panel rehearing. In response to the petition for rehearing, the opinion of the court issued on July 12, 2007, at --- F.3d —, 2007 WL 2007333 (5th Cir. 2007), is withdrawn, and the following is substituted.

This appeal arises from the district court's grant of summary judgment in favor of Washington Mutual Bank ("Washington Mutual") on Philip Berquist's claim of age discrimination. We affirm the district court's judgment.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Berquist began his career working in the internal audit department of United Savings Bank. In 1992, Bank United acquired United Savings Bank, which retained Berquist as an employee. Berquist received several promotions during his tenure with United Savings Bank and Bank United. In 2000, Bank United merged with Washington Mutual. Washington Mutual asked Berquist to stay an additional nine months after the merger to help consolidate the risk rating grids used in the two credit review departments. Berquist accepted this offer.

Following this nine-month period, Washington Mutual offered Berquist a permanent position. Berquist held the position of "Senior Credit Examiner, Loan Review Department, Corporate Credit Risk Management." Berquist alleges that he was qualified for the new position, he received "exceeds expectations" performance evaluations in 2001 and early 2002, and he never received written or verbal notices criticizing his job performance. In September 2002, Washington Mutual hired Melissa Martinez to supervise the bank's credit review function, and in early 2003, promoted Martinez to Chief Credit Review Officer. Martinez served as the corporate manager of Berquist's duties throughout the deterioration of his employment relationship with the bank.

In November 2002, the bank decided to transfer Berquist's then-current job functions from Houston, Texas, to Seattle, Washington. In light of this business decision, Washington Mutual offered Berquist a different job in the credit review department. Washington Mutual contends that Berquist's work tasks, prior to November 2002, only involved operational and administrative duties. After this date, Berquist's job duties required credit review skills. Martinez asked Berquist to work on the "review and approval" of unissued loan reports. Berquist accepted this job position and exclusively focused on "review and approval" work from early November 2002 to February 6, 2003.

2

In late 2002, the credit review department of the Houston office was staffed by Berquist, age 54, Ron Yancis, age 56, Donald Plaisance, age 39, and Karl Zatopek, age 41. Berquist and Yancis worked in the Commercial Banking Group ("CBG") under the management of Robert Granfelt. Plaisance and Zatopek worked in the Specialty Finance Group ("SFG") under the management of Cynthia Hart, and later under the immediate supervision of Scott Frazee. Frazee's counterpart position in CBG remained vacant, and therefore, Frazee acted as the administrative manager for both groups.

During a December 2002 conference call, Berquist alleges that Martinez said, "Performance issues will be promptly and aggressively dealt with. We will build leaders internally and attract younger talent." On February 6, 2003, Martinez reported to Berquist that she was "very unhappy" with the Houston office's production. Shortly thereafter, Martinez issued Berquist a performance improvement notice ("PIN"), criticizing Berquist's allegedly negative attitude, poor communication skills, and below standard work product. The PIN also alleged that Berquist's "[t]echnical skills and proficiencies are 'operational' in nature and not commensurate with the job function, CCR [Corporate Credit Review] focus, or those required for a Credit Review Officer."

In response to the PIN, Berquist asked for specific examples, which he never received from Martinez. Berquist denied every allegation of poor work performance in a written response. Berquist conceded that his work experience before the merger was "strictly in an administrative and operational role," and based on his understanding, Washington Mutual asked him to remain with the bank to "continue in [his] administrative and operational duties." Further, Berquist adds that "I have never at any time represented to anyone that I have specific expertise in credit review since my

3

responsibilities at both Bank United and [Washington Mutual] were solely of an administrative and operational nature."

On May 14, 2003, Martinez told Berquist that his skills and proficiencies were no longer needed in the credit review function. Martinez allowed Berquist forty-five days to find a position in another department of Washington Mutual. Berquist asserts that he asked Martinez to downgrade his PIN so as to not prevent an internal transfer to another position, but she denied this request.

On June 9, Washington Mutual offered Berquist a separation proposal, which he refused to accept. Following this offer, on June 26, 2003, Martinez conveyed to Berquist that he would be laid off in conjunction with a reorganization of the CBG. Washington Mutual contends that it decided for business reasons to eliminate the CBG function in Houston and transfer the group to Seattle or California because the West Coast handled a greater portion of the CBG's asset base. Based on this avowed business decision, Berquist did not receive forty-five days to secure another position.

Berquist filed suit against Washington Mutual alleging violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA"), and Washington Mutual moved for summary judgment. The district court granted Washington Mutual's motion. The court concluded that Berquist failed to establish a prima facie case of wrongful termination based on age discrimination because the record lacked evidence of Berquist's qualifications for his position. Additionally, the court concluded that Berquist failed to establish a prima facie case of "reduction in force" based on unlawful age discrimination because the record lacked evidence of Berquist being qualified for another position in the company. Berquist does not appeal the district court's holding on his claim of reduction in force based on unlawful age discrimination; therefore, we address whether the district court properly granted summary judgment on his wrongful termination claim.

4

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same legal standards as the district court. *Machinchick v. P.B. Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). In deciding a motion for summary judgment, the court must determine whether the submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Hart v. Hariston*, 343 F.3d 762, 764 (5th Cir. 2003). In deciding whether a fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reeves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). "Even if we do not agree with the reasons given by the district court to support summary judgment, we may affirm the district court's ruling on any grounds supported by the record." *Lifecare Hospitals, Inc. v. Health Plus of Louisiana*, 418 F.3d 436, 439 (5th Cir. 2005) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1534 n. 12 (5th Cir.1994)).

## III. DISCUSSION

Under the ADEA, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "A plaintiff can demonstrate age discrimination in two ways, either through: direct evidence or by an indirect or inferential [circumstantial] method of proof." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004). A plaintiff relying on circumstantial evidence must put forth a prima facie case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006). If

5

a plaintiff produces direct evidence of discrimination, no further showing is required, and the burden shifts to the employer.[1] *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121-22 (1985).

To establish a prima facie case of age discrimination based on circumstantial evidence, "a plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Rachid*, 376 F.3d at 309 (internal quotations and citations omitted); *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 575-76 (5th Cir. 2003). Berquist fulfills the first and third elements of a prima facie case: he was terminated from his position and he was a member of the protected class at the time of discharge. With respect to the remaining elements, we first determine whether Berquist fulfilled the second component of a prima facie case, demonstrating his qualifications for the position of a credit review officer.

A.    Whether Berquist was Qualified for the Position

According to Berquist, he met the objective criteria listed in a job posting for credit review officers and held the title of "credit examiner" for two years after the merger. Berquist contends that he has performed the same job since 1994, which includes the operational, audit, and administrative areas of credit review. To the contrary, Washington Mutual argues that absent the reorganization eliminating Berquist's job function, Berquist still could not have remained in his position as a credit review officer. Washington Mutual explains that Berquist lacked any background and experience in credit process review; instead, Berquist only held internal audit positions during his seventeen years at United Savings Bank and Bank United. Washington Mutual maintains that Berquist's prior work

---

[1]Berquist does not present direct evidence of discrimination.

experience included cataloging the risk grades of Bank United loans and preparing audit committee reports.

The district court concluded that Berquist was not qualified for his position at Washington Mutual because "the fact that Berquist was given the position of Credit Review Officer in the first place [does not] constitute evidence that he was qualified. To hold otherwise would be to eliminate the qualification element in every case involving termination." The district court's conclusion was error and expressly foreclosed under Fifth Circuit precedent established in *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988). The record does not reflect that the district court considered *Bienkowski* in its analysis of Berquist's claim; similarly, Washington Mutual did not address *Bienkowski* in its brief to this court.

In *Bienkowski*, an employer alleged that the plaintiff was not qualified for his job as a security representative, even though his performance had been satisfactory for ten years, "because his supervisors became unsatisfied with his work." *Id.* at 1504-05. The employer submitted two affidavits from the plaintiff's supervisors documenting a decline in his performance. *Id.* at 1505. The employer argued that under the *McDonnell Douglas* test, the plaintiff must prove that he performed his job to the standards of his employer. *Id.* Thus, the plaintiff failed to establish a prima facie case. *Id.* This court reasoned that

> [A ] plaintiff challenging his termination or demotion . . . can ordinarily establish a prima facie case of age discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action. . . .
>
> By this we mean that plaintiff had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired.

7

*Id.* at 1506 & n.3. The court established this rule in order to simplify application of the *McDonnell Douglas* paradigm in the context of termination and demotion cases. The court concluded that in applying this reasoning, "[t]he lines of battle may then be drawn over the employer's articulated reason for its action and whether that reason is a pretext for age discrimination." *Id.* at 1506.

After the merger, Berquist monitored the process of conforming Bank United's risk ratings to Washington Mutual's rating system. Once Berquist completed the conversion, Washington Mutual assigned Berquist to a credit process review position. Washington Mutual interprets Berquist's response to the PIN issued in March 2003, reiterating his skills in the operational and administrative side of credit review, as an admission that he lacked qualifications in the credit review arena. Washington Mutual characterizes his statements as "undisputed evidence," demonstrating that "[Berquist] did not have the skills, experience and background for credit review process work" at Washington Mutual. More specifically, Washington Mutual maintains that Berquist could not lead a credit review examination through origination, administration, and follow-up.

Similar to the plaintiff in *Bienkowski*, however, Berquist possessed the same job qualifications when Washington Mutual terminated him as when Martinez assigned him to the credit review position. Accordingly, Berquist need not show that his performance met Washington Mutual's expectations to establish a prima facie case. Although Washington Mutual submitted evidence that Berquist's supervisors were not pleased with his performance, this evidence does not prove a lack of qualifications at the prima facie stage. *See Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001) (holding that an employer may not utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process is challenged as discriminatory); *Lindsey v. Prive Corp.*, 987 F.2d 324, 327 (5th Cir. 1993) (holding

8

that it is not appropriate for the district court to determine whether subjective criteria are bona fide, in effect making dispositive determinations about the employer's credibility, on summary judgment). As aptly stated in *Bienkowski*, "[p]lacing a plaintiff's 'qualifications' in issue at both the prima facie [] and pretext stages of a termination case is an unnecessary redundancy." *Id.* at 1505. Therefore, for the limited purposes of establishing a prima facie case, Berquist demonstrated that he was qualified for his position.

B.     Whether Berquist was Otherwise Discharged Because of His Age

The final prong of establishing a prima facie case of age discrimination requires Berquist to show that he was replaced by someone outside the protected class, replaced by someone younger, or otherwise discharged because of his age. *Rachid*, 376 F.3d at 309. The district court did not reach this issue, but the parties presented arguments on this final element before the district court and this court on appeal.

As a starting point, the record does not support a finding that Berquist was replaced by someone either outside the protected class or by someone younger than himself. Berquist argues that Washington Mutual's decision to terminate him and Yancis, the two older employees in the Houston office, while offering the younger Plaisance and Zatopek the option of transferring to the Dallas office proves age discrimination. The undisputed facts surrounding Berquist's job function and Washington Mutual's reorganization, however, do not demonstrate that Berquist was *replaced* by Plaisance and Zatopek. As explained in greater detail below, Plaisance and Zatopek, the SFG credit process reviewers, remained in the Houston office for several months after Berquist's CBG functions were transferred to California. Moreover, Berquist presented no evidence to show who Washington

9

Mutual hired to work in the California office. Therefore, the only path available for Berquist to establish a prima facie case is to show that he was "otherwise discharged because of his age." *Id.*

1. Martinez's Remarks

Berquist asserts that Martinez's comments regarding the desire to "attract younger talent," and her reference to Plaisance and Zatopek as the "younger" credit review officers, support his claim of age discrimination. Statements evince unlawful discrimination only if the comments "first, demonstrate discriminatory animus and, second, [are] made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker." *Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000)). Under this test, Martinez's comments do not constitute evidence of age discrimination.

Martinez made the first comment regarding younger talent in December 2002, six months before Washington Mutual terminated Berquist, and the comment does not at all relate to this employment decision. According to Berquist's contemporaneous transcription of the comment, Martinez stated that "Performance issues will be promptly and aggressively dealt with. We will build leaders internally and attract younger talent." Washington Mutual contends that regardless of whether Martinez expressed an intention to attract younger talent, this remark was too vague and remote in time to show any discriminatory animus on the part of Washington Mutual in terminating Berquist.

Martinez made no mention of replacing older employees with younger recruits or directly hiring younger employees into leadership positions. Unlike other cases in which we have considered remarks as evidence of discriminatory intent, this comment was a broad statement not directed to any

10

particular employee about her management goals and remote in time from Berquist's firing. *See Machinchick v. PB Power, Inc.*, 398 F.3d at 345, 353 (5th Cir. 2005) (supervisor sent e-mail, just weeks before terminating plaintiff, discussing plans to "strategically hire some younger engineers and designers"; supervisor said plaintiff was "inflexible" and "not adaptable"); *Rachid*, 376 F.3d at 313, 315 (holding that employer's ageist comments "to and about" employee constituted evidence of age discrimination); *Bienkowski*, 851 F.2d at 1507 n.4 (holding that comments requiring the employee to look "sharp" and criticizing an inability to adapt to new procedures constituted evidence of age discrimination); *Palasota*, 342 F.3d at 576 (supervisor sent a memorandum, two months before plaintiff's termination, recommending severance packages for fourteen named employees, all of whom were specifically identified as over fifty years of age, to create "the flexibility to bring on some new players"). Accordingly, in this context, we conclude that this statement is not evidence of age discrimination.

As to Martinez's reference to Plaisance and Zatopek as "younger" employees, Washington Mutual asserts, and Berquist offers no alternative interpretation, that Martinez made this comment to contrast Plaisance and Zatopek with Berquist, the "senior employee" in the department. In his role as the senior employee, Martinez expected Berquist to provide leadership for the inexperienced members of the group. Berquist provides a similarly harmless interpretation of this statement in his response to the PIN, which was written prior to this litigation. Berquist's writes that

> The criticism mentioned repeatedly on March 4 from Ms. Martinez and Ms. Hart was that I did not notify them of the lack of desk reviews being sent to Houston to be performed "by the young guys" in the Houston office. I responded that since I reported directly to Ron Yancis at the time, it was not in my work experience to "go over my boss's head" directly to Credit Review management. . . . Ms. Martinez told me that I was a "senior officer" in this office and that other two employees in the

11

department besides former Regional Manager Ron Yancis and myself were inexperienced young men who needed leadership.

Based on Berquist's personal impressions of the statement, we decline to characterize this comment as anything more than a comment unrelated to an unlawful discriminatory animus. Both statements are consistent with Washington Mutual's stated commitment to build leaders internally based on available resources within the corporation. Accordingly, Martinez's comments are not sufficient evidence of age discrimination.

2.      Other Circumstantial Evidence

In addition to the above remarks, as stated *supra*, Berquist contends that Washington Mutual's decision to terminate him and Yancis, the two older Houston employees, while offering the younger Plaisance and Zatopek the option of transferring to the Dallas office further supports his claim of age discrimination. According to Berquist, all four employees were performing the same SFG work at the time of his termination. Berquist also maintains that Washington Mutual's age bias prompted Martinez to issue only the older employees a PIN. Berquist contends that Washington Mutual then suggested an internal transfer to resolve his employment issues but refused to facilitate this action because Martinez would not downgrade his PIN.

Washington Mutual contends that the disparate treatment of Berquist and the younger employees, Plaisance and Zatopek, was based on the differing job functions performed by the two sets of employees. Washington Mutual argues that, although Berquist performed overflow work from SFG, everyone in Houston pitched in to work on SFG's reports during downtime. Plaisance and Zatopek were the only two employees, however, with years of experience in this specialty area.

12

In disparate treatment cases, the plaintiff-employee must show "nearly identical" circumstances for employees to be considered similarly situated. *Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 210 (5th Cir. 2004) (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). Berquist performed an array of jobs after the Bank United-Washington Mutual merger. Berquist initially stayed with the bank, at the request of Don Dahrens, for the specific purpose of assisting with the conversion of Bank United's risk grading system for loans to Washington Mutual's system. In late October 2002, Washington Mutual moved this function to Seattle, Washington, and Berquist no longer worked with converting the risk rating grids.

Martinez then assigned Berquist to a national team reviewing a residential construction portfolio. After the group's first meeting, Martinez removed Berquist from the residential construction portfolio and asked him to assist with the review and approval of credit reports. This assignment involved clearing a large backlog of unissued loan review reports. At some point in early March, Berquist began working on change request summaries ("CRS"). CRS's require a determination of whether to increase or decrease a customer's credit rating based on a credit review. In her deposition, Martinez explained that the CRS process was segmented into two teams, the SFG and CBG. SFG handled a different business line from CBG, CBG involved a larger work load and larger assets under management. Martinez also stated that "[i]f there was overflow from SFG then that would be allocated, and then Mr. Berquist may have been assigned those."

Martinez's explanation comports with Berquist's account of the work distribution. Berquist testified that during slow periods, after receiving a stack of CRS's in the mail, someone simply grabbed a stack of CRS's without any regard to whether the files dealt with SFG or CBG loans. Berquist also testified in his deposition that after receiving his PIN, the Houston group received an

13

email from either Martinez or Cynthia Hart, the SFG manager, announcing that Zatopek and Plaisance were being permanently assigned to the SFG function. In this capacity, Zatopek and Plaisance attended a national meeting concerning their duties in the SFG position. Berquist and Yancis did not attend this meeting. Moreover, Berquist and Yancis directly reported to Bob Granfelt, and only in the event of a workflow issue did these two employees report to Frazee as their administrative supervisor. Frazee managed the tracking system of work assignments for the Houston office. Finally, to this court, Berquist represented that he was initially assigned SFG work and then assigned to the CBG position. Thus, the PIN and Berquist's response to the PIN "pertained to [his] SFG work, not the CBG position that Appellee alleges [he] was assigned after he was given his PIN."

The explanations provided by Martinez and Berquist regarding the division of labor in the Houston office demonstrate that Berquist was not similarly situated with Zatopek and Plaisance; therefore, the employment decisions applied to Zatopek and Plaisance cannot be used to support Berquist's claim of age discrimination. Accordingly, based on the uncontroverted evidence, Berquist cannot argue that Zatopek and Plaisance were similarly situated employees treated differently from himself based on unlawful age discrimination.

Berquist also argues that the PIN from Martinez accounts for one additional peg in the series of discriminatory events leading to his termination. Berquist asserts that the PIN supports his claim of age discrimination because it directly conflicts with verbal conversations between himself and Martinez, and only the two older employees, himself and Yancis, received a notice. Berquist also maintains that Frazee refused to participate in the PIN because he did not agree with Martinez's performance assessment.

14

In early 2003, the Corporate Credit Review department of Washington Mutual consisted of seventy-one percent of employees over 40, and thirty-seven percent of employees over 50. During the reorganization, Martinez issued PIN's to only five employees under her management. Based on Berquist's admission that he lacked skills in SFG review, his then-current position, it is difficult to interpret the negative evaluation as motivated by age discrimination. On February 27, 2003, Berquist sent an email to Martinez attempting to carve out a position better suited for his operational and administrative skill sets. In the message, Berquist listed his prior work experience and states the following:

> As you know, my overall background has been in auditing and operational review. . . .
>
> In our initial meeting last year, I told you that I really love doing operational reviews. I believe that this is where my greatest strengths are. This is where I believe that I can be of best value to you and the entire Corporate Credit Review organization of Washington Mutual. . . .
>
> As you are aware and can see from the above, there are extensive operations and credit activities located and headquartered in the Phoenix Tower [in Houston, TX]. I would like to volunteer to dedicate my activities to these critical operational and credit areas in Houston and their respective field offices. In addition to documenting and reviewing all of the above operational activities as they relate to Credit Review, I also could attend regular meetings of these groups as they relate to credit issues as not only your representative, but for the team leaders as well.

Prior to the reorganization, and in response to his PIN dated March 4, Berquist wrote the following:

> I have never at any time represented to anyone that I have specific expertise in credit review since my responsibilities at both Bank United and Washington Mutual were solely of an administrative and operational nature. At no time prior to March 4, 2003, was I ever advised that my lack of experience in credit review was an impediment to my continued employment and certainly not that it was grounds for termination.

In his deposition, Berquist once again confirmed that he has no specific expertise in credit review.

To reconcile the admissions in his PIN response and deposition, Berquist proffered that in his

15

opinion, "the skills involved in financial and operational auditing involve some of the same skills that are needed for corporate credit review. I believe that [] inquiries–requires an intuitiveness, a curiosity, and an ability to read and understand financial statements and documents." Berquist never presents evidence to refute the fact that the PIN accurately pinpoints his deficiencies in the credit review skills necessary to be a SFG credit process reviewer.

Berquist also insinuates that Scott Frazee refused to participate in the March 2003 PIN because he had no problems with Berquist's work. To the contrary, Frazee explained in his deposition that he didn't participate in Martinez's evaluation of Berquist because he didn't have firsthand knowledge for the basis of her concerns and needed time to specifically assess Berquist's work. Frazee described that a process reviewer leads the credit review and a file reviewer conducts the necessary supporting file work. A process reviewer position typically requires at least four to five years of file review experience. Based on Berquist's work product, Frazee assessed that Berquist understood the basic concepts of credit review but lacked the capability and background to provide an appropriate assessment of more complex files.

Ironically, Martinez attempted to use the PIN as a gateway for securing Berquist's long-term employment at Washington Mutual in a department better suited for his self-identified skill sets. Martinez and Julie Aydelotte, an employee relations manager, called Berquist to discuss a transfer to another department within Washington Mutual. Berquist recorded and transcribed many of these telephone conversations. In the initial discussion, on May 13, 2003, Martinez told Berquist that,

> What we want to discuss with you today and what we want you to think about is really working with you to find, to see if we can find you another position within the company. You know, your skill sets and the contribution that you could provide Washington Mutual from a global basis, I definitely think there is some contribution there. The issue really becomes are those skill sets what are needed in the Credit

16

Review function and I think at this point in time the answer is no. But I think we also want to recognize the historical performance as far as your contribution to the department and see what we can do to help you.

Also in this conversation, Martinez discussed with Berquist a 45-day period to find another position and her willingness to discuss the PIN with any interested managers within the company. Berquist requested to receive his severance package offered during the acquisition period, but Aydelotte explained that Berquist's working for two years had negated the original severance plan.

Over the next several weeks, Aydelotte and Berquist communicated regarding his search for a new position and the severance package. Berquist resisted applying for another position because (1) Martinez did not completely fill-out his transfer form, and (2) Berquist questioned his ability to transfer in light of the company's policy regarding employees with a negative performance evaluation on file being ineligible for a transfer. Aydelotte advised Berquist that "[w]hat you need to do is to apply on-line if you find something that you are interested in and then we can work through this part with the recruiters." Aydelotte testified in her deposition that, "in the conversation Melissa had with Phil on the May 13th, was that she would authorize a transfer, that it was okay for him to look internally for a position that better suited his experience, and that if he found something I would work with a recruiter and that she would approve him to transfer." On June 10, 2003, Aydelotte offered Berquist the requested 38-weeks severance package in the form of a separation agreement. Berquist refused the offer because the paperwork included a confidential settlement and release agreement.

Based on this evidence, confirmed and undisputed by Berquist on the pertinent points, the PIN highlighted his self-acknowledged lack of experience with credit review. Washington Mutual documented this skill deficiency, yet at the same time, attempted to retain Berquist in another position. When Berquist refused to look for another position, Washington Mutual offered Berquist

17

a severance package identical to the amount offered at the time of the merger. Berquist then declined this offer. Berquist provides no evidence to diminish the veracity of Washington Mutual's position or to show a causal connection between Washington Mutual's adverse employment action and his age. To the contrary, Berquist readily admits through inconsistent statements that he was not working in the SFG position at the time of his termination, he lacked the skills necessary to perform the work assigned to Plaisance and Zatopek, and he refused to cooperate with Martinez's and Aydelotte's attempts to accommodate his requests. Based on this evidence, a reasonable trier of fact could not determine that Washington Mutual otherwise discharged Berquist based on his age.

C.    Legitimate, Non-discriminatory Reason for Discharge

If the plaintiff establishes a prima facie case, "the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Rachid*, 376 F.3d at 312 (internal quotations omitted).

Assuming arguendo that Berquist established a prima facie case of age discrimination, the undisputed summary judgment evidence demonstrates that Washington Mutual undertook a major reorganization in the Corporate Credit Review department, which eliminated Berquist's position. Berquist fails to raise a genuine issue of material fact regarding the evidence presented to support Washington Mutual's legitimate, non-discriminatory reason for his termination.

18

Martinez came to Washington Mutual on September 30, 2003, charged with the responsibility of regenerating an underperforming group–develop a strategy and implement the appropriate methodologies to execute the process. Washington Mutual hired Martinez after the acquisition of Bank United and other banks across the country for the sole purpose of reorganizing the credit department. In a memo entitled "Corporate Credit Review: Organizational Realignment," dated December 3, 2002, Washington Mutual provided an overview of the planned organization of the credit review department, including the closing of certain offices and the creation of new positions. In the December 9 meeting, Berquist recalls Martinez giving notice about a "formal [departmental] reorganization that was going to take several months to complete." In a second undated document, entitled "Corporate Credit Review Business Objective, Houston Commercial Banking Team," Washington Mutual states that

> [W]e have determined that the size of the commercial portfolio in Houston does not justify placement of resources in the local market. Additionally, Commercial Banking business objectives have not identified the Houston market as a high growth area. As a result, we have [made] the business decision to disengage Corporate Credit Review in Houston and build up capabilities in California and New York to support existing and planned growth within the Commercial Banking group.

On June 25, 2003, Berquist and Yancis, both employees of Corporate Credit Review focusing on commercial portfolios in Houston, were notified that their positions would be eliminated. After announcing the decision to relocate the CBG function, both men were offered a severance package with the option to be re-hired in another department. This offer required them to sign a release agreement. On September 29, 2003, Yancis, age 58, started a different position in Mortgage Banker Finance with Washington Mutual, but Berquist chose not to accept the severance package. Moreover, similarly situated employees willing to follow procedures were re-hired within other

departments. Shortly thereafter, in July 2003, the Corporate Credit Risk Management team in Seattle also consolidated, and three positions were eliminated from this department. Two of the employees over the age of forty, Phil Stanley, age 51, and Leone, age 58, accepted different positions with Washington Mutual. Berquist presented no evidence to contradict Washington Mutual's legitimate, non-discriminatory reason for eliminating his position.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment.

AFFIRMED.